## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **ERIC LAWTON**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: |
| | ) | |
| **GEORGIA DEPARTMENT OF** | ) | |
| **PUBLIC SAFETY,** and its Division**,** | ) | |
| the **GEORGIA STATE PATROL,** | ) | |
| | ) | |
| **TOMMY WALDROP**, individually and in | ) | |
| his official capacity under color of law as | ) | |
| Major, Georgia State Patrol. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR MONETARY DAMAGES

Plaintiff, State Trooper Eric Lawton, files this Complaint against Defendants

Georgia Department of Public Safety, Georgia State Patrol, and Tommy Waldrop,

using 42 U.S.C. § 1983 to vindicate his rights to equal protection under the

Fourteenth Amendment of the U.S. Constitution; and using 42 U.S.C. § 2000e, et.

seq. to vindicate his rights to be free from racial discrimination under Title VII of

Civil Rights Act of 1964.

## **INTRODUCTION**

In a rare occasion, the Equal Employment Opportunity Commission (EEOC) found reasonable cause that the Defendants named in this action violated Mr. Lawton's right to be free from racial discrimination. (See Ex. 1.) Eric Lawton, who is African American, was hired by the Georgia Department of Public Safety on October 1, 2017 to serve as a State Trooper. This fulfilled a lifetime dream of Trooper Lawton who, as early as age five, envisioned himself as a law enforcement officer, and subsequently fulfilled his dream:

 

But Defendants dashed that dream quickly and unlawfully. During his employment probationary period, Defendants visited Mr. Lawton at his home to inform him that he had been suspended; then, less than eighteen hours later, an agent of Defendants' drove Mr. Lawton to Atlanta, where Defendant Waldrop summarily terminated Mr. Lawton's employment. Defendants' actions crippled

Mr. Lawton' ability to find another job within the law enforcement field for over a year.

The two reasons given for Mr. Lawton's termination were sham reasons, obvious pretext, as evidenced by the treatment of Mr. Lawton's materially situated, Caucasian State Trooper counterparts. Mr. Lawton was the only African American State Trooper at his Post 13.

One example of this race-based discrimination was the undeniable fact that Mr. Lawton's materially situated Caucasian counterpart was provided an opportunity to resign (and even transfer post) prior to termination; whereas Mr. Lawton was flat-out terminated, with no option to transfer post or resign. Also, Mr. Lawton and one of his materially situated Caucasian counterparts supposedly had a like performance-training issue; however, while Mr. Lawton's materially situated counterpart was given extensive re-training, Defendants failed to even tell Mr. Lawton his performance was an issue, which comes of little surprise because the facts surrounding this *alleged* performance deficit demonstrate that Mr. Lawton both followed governing policy and the advice of his direct report, commanding officer.

Pretext is all over this case in so many ways that, once the facts are understood, the EEOC's rare finding of cause for discrimination become not so shocking.

## **JURISDICTION AND VENUE**

1.

Jurisdiction is proper as this Court has subject matter jurisdiction of the federal claims asserted in this action under 28 U.S.C. §§ 1331 and 1343(a)(4), and 42 U.S.C. § 1983.

2.

This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

3.

Venue is proper under 28 U.S.C. § 1391(b) and L.R. 3.1(B)(3) because (1) a substantial part of the events and omissions giving rise to Trooper Lawton's claims occurred within this District and Division and (2) Defendants reside and transact business in this District and Division.

## PARTIES

4.

**Plaintiff, Eric Lawton,** is an African American, adult male who was

employed by Defendant Georgia Department of Public Safety, Georgia State Patrol

Division. At all times relevant to this Complaint, Plaintiff was a citizen of the

United States and a resident of Georgia. At all times relevant to this Complaint,

Lawton had clearly established legal rights under state and federal law and the

United States Constitution such as to be free from racial discrimination and to

enjoy equal protection of the law of this country. Lawton submits himself to the

jurisdiction and venue of this Court and is entitled to bring this action under state

and federal law for all general, special, and any other permissible damages.

5.

**Defendant Georgia Department of Public Safety, and its Division**

**Georgia State Patrol,** is a state government agency or subdivision and is sued as

an employer under Plaintiff's Title VII claim. Defendant GDPS and GSO have an

office located in Fulton County, Georgia. At the time of the subject event that has

given rise to this lawsuit, Defendant Georgia Department of Public Safety was the

public employer of Plaintiff Lawton. Lawton is using the U.S. Constitution, federal

statutes, 42 U.S.C. § 1983, and other applicable federal laws, as the vehicle to sue Defendant GDPS regarding his federal claims.

6.

**Defendant Thomas Waldrop,** at all times relevant, was a commanding officer with the rank of Major within the Georgia Department of Public Safety, Georgia State Patrol Division. At all times relevant, Waldrop had the authority to terminate all state troopers named in this Complaint while also having the authority to (1) independently require re-training upon review of a candidates file with respect to determining whether to exercise his authority to terminate a State Trooper such as Trooper Lawton; and (2) approve recommended re-training and other opportunities in lieu of exercising his authority to terminate State Troopers such as Trooper Lawton. At no time did Waldrop require re-training of Trooper Lawton prior to terminating Trooper Lawton's employment. At all times relevant, Waldrop was responsible for knowing all rules regulation, polices, orders and so forth that applied to his conduct, as well as knowing all laws, including case law, that placed him on notice that his alleged conduct was unlawful. At all times relevant Waldrop was acting under color of state law.

## **STATEMENT OF FACTS**

**A.   Trooper Lawton was hired as a Georgia State Patrol Officer, completed Trooper School, and began his 18-month "working test," probationary period.**

7.

Trooper Lawton was hired by the Georgia Department of Public Safety on October 1, 2017.

8.

New hires first go through Trooper School for 32 weeks, a training period which includes classroom instruction and firearms, driving, and field training.

9.

Trooper Lawton graduated as part of the 102nd Trooper School on May 11, 2018 and was assigned to Post 13 in Tifton, Georgia.

10.

Trooper Lawton was the only African American Trooper at Post 13 from his employment start date through his employment termination.

11.

Between Trooper Lawton graduating from Trooper School and his mandatory report date to Post 13, there exists an approximate four to six-week time gap.

12.

Trooper Lawton first reported to duty as a Trooper at Post 13 on June 18, 2018.

13.

From his employment start date, Trooper Lawton was under an 18-month probationary period, called a "working test," during which he, along with all other troopers, must demonstrate to the satisfaction of the Commanding Officer, to include Major Waldrop, that they possess the necessary knowledge, ability, aptitude, and other qualities to successfully perform the duties required of their position.

**B.   Out of nowhere Waldrop suspends Lawton and within 24 hours has him brought to Atlanta, where Waldrop summarily terminates Lawton's employment.**

14.

On August 15, 2018, approximately two months after Trooper Lawton's first day as a Trooper at Post 13, Sergeant Peter Lukas informed Trooper Lawton that he would come to Trooper Lawton's house, telling him that he had some paperwork for Trooper Lawton to sign.

15.

Once arriving at Trooper Lawton's house at approximately 12:20 pm on August 15, 2018, Sergeant Peter Lukas requested that Trooper Lawton sign papers acknowledging that Trooper Lawton was being put on administrative leave with pay.

16.

After Trooper Lawton signed the papers brought by Sergeant Peter Lukas, Lukas informed Trooper Lawton that Sergeant First Class Duane Massey would call Trooper Lawton to tell him when he would pick him up the next morning, August 16, 2018.

17.

The next day, August 16, 2018, at 6 am, Sergeant First Class Duane Massey drove Trooper Lawton to Atlanta, where Trooper Lawton met with Major Waldrop.

**C.   Trooper Lawton was dismissed by Major Waldrop for two alleged reasons, which the facts demonstrate were pretext.**

18.

On August 16, 2018, Trooper Lawton's Commanding Officer, Major Thomas E. Waldrop, told Trooper Lawton that he would be dismissed from his job

for two reasons: (1) failing to arrest someone that was unlicensed on August 5, 2018; and (2) failing to arrest someone for a possible DUI on August 4, 2018.

19.

Trooper Lawton was dismissed effective August 17, 2018.

1. **The failing to arrest reason for Trooper Lawton's termination is pretext because, inter alia, Trooper Lawton was told not arrest the driver after verifying through his dispatch with the agency by whom the driver was wanted.**

20.

On August 5, 2018, Trooper Lawton pulled over a driver who was unlicensed and the Georgia Crime Information Center (GCIC) said the individual was a "wanted person."

21.

Trooper Lawton called the radio room to verify whether he should arrest the unlicensed individual and after a dispatcher verified with the agency which had wanted said driver, the dispatcher told Trooper Lawton *not to place a hold on the driver*, i.e., not to arrest the driver.

22.

Trooper Lawton's Post Commander, Sergeant First Class Duane Massey, never instructed or trained Trooper Lawton to formally arrest a person who was unlicensed.

23.

The policy handbook effective during all relevant times, specifically policy number 11.01, did not require Trooper Lawton to arrest this unlicensed driver when he was told by dispatch not to arrest the driver; furthermore, that same policy did not list this situation as one in which arrest was mandatory.

24.

Trooper Lawton's Post Commander, Sergeant First Class Duane Massey, never taught, instructed, or directed Trooper Lawton to take an unlicensed driver to jail.

25.

On August 5, 2018, instead of arresting the unlicensed driver, Trooper Lawton wrote a citation for driving without a license and gave the driver a warning for a seat belt violation.

26.

It is common practice to write a citation for a driver that is driving unlicensed.

27.

There is a video of the August 5th stop, which has poor audio quality due to a faulty microphone.

28.

Sergeant First Class Duane Massey stated in his report that

Trooper Lawton was trying to make a deal with the unlicensed driver; the sole

evidence of this is Trooper Lawton saying, "that's fair, right?" and "deal."

29.

Defendants Georgia Public Safety Department and Waldrop suggested that

Trooper Lawton conspired with the driver in order to provide the driver with a

lower penalty instead of arresting him, even though Waldrop knew prior to

terminating Trooper Lawton that Trooper Lawton was told not to hold the driver.

**2. The DUI reason for Trooper Lawton's termination is pretext because, inter alia, the driver passed the most reliable tests, including a breathalyzer test that registered 0.00.**

30.

On August 4, 2018, an Enigma Police Department Officer stopped a vehicle

and believed the female driver was DUI, so he requested assistance from Georgia

State Patrol Tifton; Trooper Lawton was called for this Agency Assist.

31.

When Trooper Lawton arrived at the scene where the female was suspected

of DUI, Trooper Lawton performed multiple tests, including the Horizontal Gaze

Nystagmus tests and breathalyzer test, which are the two most exacting, reliable

tests regarding the detection of DUI; the driver passed both tests, scoring a 0.00 on the breathalyzer.

32.

Defendants saw the female suspected of DUI pass these two reliable tests on the video they reviewed.

33.

After the driver passed both the breathalyzer test and the Horizontal Gaze Nystagmus tests, Trooper Lawton informed his direct report, Sergeant First Class Duane Massey, that the driver passed the tests and Massey told Trooper Lawton to perform a modified Rhomberg test on the driver, and after performing all these tests, neither the local agency officer nor Trooper Lawton arrested the driver, because Trooper Lawton did not observe any signs of DUI or any signs that would likely sustain a conviction of a DUI, per his training.

34.

Critically, when there appears insufficient evidence to sustain a conviction of a DUI arrest, Trooper Lawton and others were trained not to arrest the individual because determining when to arrest for a DUI takes in the likelihood of successfully prosecuting said DUI; this reality is evidenced by the evaluation of materially-situated comparator Trooper Anthony Roberts. According to Roberts

command officer, Roberts made critical errors that would lead to DUI charges being dismissed or reduced, and that reality was viewed as a negative with respect to Robert's performance evaluation: "During his time here in Athens, TPR Roberts has made several DUI arrests. After reviewing those incidents, these cases will likely be dismissed or at best reduced due to TPR Roberts making critical errors."

35.

Although Defendants claim to have reviewed the DUI video from the August 4, 2018 traffic stop and allegedly concluded that there were signs of a possible DUI that should have led to an arrest, Trooper Lawton never knew of this assessment until the EEOC sent the document to him by email on October 17, 2018.

36.

Before his termination, Trooper Lawton was never disciplined for said August 4, 2018 traffic stop or told that his handling of the stop demonstrated poor skill/judgment.

37.

Defendants did not afford any remedial training to Trooper Lawton before Defendants terminated his employment with respect to DUI traffic stops, even though Defendants had the authority permit/require said training.

**D.   The EEOC found Trooper Lawton's Title VII rights were violated.**

38.

After his termination, Trooper Lawton filed a complaint with the EEOC on September 6, 2018, alleging that he had been discriminated against because of his race.

39.

On July 15, 2019, the EEOC sent a pre-determination letter to the Georgia Department of Public Safety, informing them that their preliminary finding was that the Department had violated Trooper Lawton's Title VII rights.

40.

On August 7, 2019, Darrell Graham, Director of the EEOC Atlanta District Office, issued a Letter of Determination finding that there is reasonable cause to conclude that Trooper Lawton was discriminated against because of his race. Ex. 1.

41.

The EEOC's August 7, 2019 Letter of Determination stated that the evidence showed that the Georgia State Patrol **failed to follow their own policy for the purposes of creating a pretext to discriminate against Trooper Lawton because of his race.** Ex 1.

**E.   Materially situated comparators, including comparator Trooper Anthony Roberts, were treated significantly different from Trooper Lawton.**

42.

Although Defendants allege that African American Trooper Lawton made several mistakes, these allegations are ***un***supported by credible evidence and thus serve as pretext.

43.

Five Caucasian state troopers that held Trooper Lawton's same rank and made the mistakes alleged of Trooper Lawton were provided, by Defendants, with re-training and opportunity after opportunity to keep their jobs; in fact, all of these individuals either kept their job or were given the opportunity to resign prior to termination. These five Caucasian state troopers are Anthony Roberts, Ashley Barnes, Stephen Pritchett, Frank Gay, and Ashley Williams.

44.

The Georgia State Patrol's remedial training pairs a rookie officer with a veteran officer for hands-on training and a senior officer then makes daily observations about the rookie for a certain period, such as three to four weeks.

45.

At all relevant times, Defendant Major Waldrop was the commanding officer with the authority to approve or disapprove remedial training for Trooper Lawton; Anthony Roberts; Ashley Barnes; Stephen Pritchett; Frank Gay; and Ashley Williams, along with being the Commanding Officer who was responsible for making the decision to terminate the employment of Eric Lawton; Anthony Roberts; Ashley Barnes; Stephen Pritchett; Frank Gay; and Ashley Williams.

**1.  Comparator, Anthony Roberts, used by the EEOC**

46.

Trooper Anthony Roberts, who is white, graduated from the same Trooper School as Trooper Lawton and was assigned to Post 32 in Athens, Georgia.

47.

EEOC investigator Sandra Pope interviewed Trooper Anthony Roberts by phone on April 17, 2019.

48.

Trooper Roberts struggled with performing his duties, particularly with conducting Standard Field Sobriety Tests when dealing with **DUIs**.

49.

Major Waldrop provided Trooper Roberts with remedial training as a result of his difficulty in conducting the Standard Field Sobriety Tests, and then Trooper Roberts was assigned to Trooper Patterson for further hands-on training in conducting Standard Field Sobriety Tests.

50.

Trooper Roberts began remedial field training on July 23, 2018 under the supervision of Trooper Patterson #601, and there were at least 13 daily observations to monitor Trooper Roberts' progress.

51.

Despite the extra training, Trooper Roberts still had problems conducting Standard Field Sobriety Tests and he was told that is was not likely he would pass his "working test," probationary period.

52.

Trooper Roberts was placed on administrative leave with pay on August 8, 2018.

53.

Trooper Roberts was made aware that he was to meet with Major Waldrop and likely to be discharged; whereas, Trooper Lawton was given no warning whatsoever that he would be discharged.

54.

Before he met with Major Waldrop, Trooper Roberts decided to resign on August 15, 2018.

55.

Trooper Roberts was never presented with discharge papers to sign.

56.

Trooper Roberts was very apprehensive about speaking with EEOC investigator Sandra Pope and was in a hurry to get off the phone because he still had "to live in the community."

**2.  Other Comparators**

57.

Trooper Barnes, a Caucasian individual, while on her probationary period and at the same rank as Trooper Lawton, failed to identify DUIs on multiple occasions, but Trooper Barnes still has her job.

58.

Upon information and belief, Defendants approved remedial training for Trooper Barnes after she failed to identify DUIs on multiple occasions, and as a result of this remedial training, Trooper Barnes has been able to keep her job.

59.

Trooper Stephen Pritchett, a Caucasian individual at the same rank as Trooper Lawton, while his probationary period, admitted to Trooper Lawton that he often made mistakes which raised safety concerns and used to make the NCOs nervous.

60.

Defendants approved additional re-training for Trooper Pritchett as a result of the mistakes raising safety concerns, and Trooper Pritchett still has his job.

61.

Trooper Ashley Williams, a Caucasian individual, told Trooper Lawton that he was having trouble with both computers and DUIs.

62.

Defendants provided Trooper Ashley Williams with re-training on DUIs and computers, upon information and belief, and Trooper Williams still has his job.

**F.   After the EEOC complaint was filed, the Georgia Department of Public Safety put forward two additional reasons for Trooper Lawton's dismissal, reasons which the facts demonstrate are pretext.**

63.

After the EEOC investigation was initiated, the Georgia Department of Public Safety said that in addition to the two reasons given for Trooper's Lawton's dismissal by Major Waldrop, there were two additional incidents that were also cause for his dismissal: (1) Trooper Lawton used a department-issued patrol car for personal use without approval; and (2) during a weapons inspection, it was found that Trooper Lawton had left a piece of his shotgun at home as a result of cleaning the weapon the night before.

**1.   Comparator Trooper Anthony Roberts is treated differently regarding the alleged misuse of a department patrol car.**

64.

In late July 2018, Defendants became aware that Trooper Anthony Roberts drove his patrol car while not logged into the CAD system as required by policy.

65.

Upon information and belief, Defendants did not request an investigation into Trooper Robert's alleged misuse of his patrol vehicle.

66.

About a month prior to refusing to request an investigation into Trooper Roberts' violation of policy regarding the use of a patrol car, Trooper Lawton's commander requested an investigation into Trooper Lawton's alleged misuse of a patrol car.

67.

After graduating from Trooper school and prior to reporting to his Post 13 position, Trooper Lawton was assigned to take home a patrol car that had over 100,000 miles on it.

68.

There was approximately a four to six week gap between the time Trooper Lawton graduated from Trooper school and the time he had to report to Post 13; because of this, Trooper Lawton drove the car approximately five different times, either around the block or about 10 miles to his mother's house, in order to ensure the battery stayed charged and the car would run smoothly, due to the fact the car **had over 100,000 miles on it**.

69.

On June 25, 2018, the command staff at Post 13 opened an investigation into Trooper Lawton's alleged misuse of his patrol car, an alleged misuse that was

exactly like that of comparator Trooper Roberts' alleged misuse, for which an

investigation was not opened.

> **2. Defendants investigation on Trooper Lawton continued even after they told him that they believe his reasons for using his patrol car while off duty.**

70.

On July 10, 2018, Trooper Nunn and Sergeant Brian Cody met with Trooper

Lawton to discuss his driving his patrol car while off duty and when

Trooper Lawton explained why he moved his vehicle, Trooper Nunn stated that he

believed Trooper Lawton.

71.

Trooper Lawton did not sign any paperwork stating he violated policy

regarding alleged misuse of his vehicle.

72.

Since both Trooper Nunn and Sergeant Cody believed Trooper Lawton's

reasons, no policy violation occurred because the car was not used for personal

purposes.

73.

During Trooper Lawton's meeting with Major Waldrop on August 16, 2018,

when Trooper Lawton was terminated, Major Waldrop never mentioned Trooper

Lawton's moving the patrol car as one of the reasons for Trooper Lawton's dismissal from his job.

74.

While Trooper Lawton may have driven his patrol car without permission in May and June 2018, even the EEOC's predetermination letter stated there was no evidence that his doing so was for 'personal purposes'; instead, all evidence demonstrates he drove the vehicle while off duty to maintain proper functioning of the vehicle, a reason that investigators told Trooper Lawton that they believed.

75.

The closing of this so-called investigation by Defendants conveniently coincided with Mr. Lawton's date of discharge, August 16, 2018, by Defendants.

**3. The alleged weapons violation that was never mentioned as a weapons violation.**

76.

On August 6, 2018, Trooper Lawton had a bullet jammed in one of the chambers of his Remington 12-guage shotgun, so he informed Corporal David Sellars and was told to come to the POST to have the weapon repaired.

77.

After getting assistance from Corporal David Sellars in clearing the chamber of his 12-gauge shotgun, Trooper Lawton took the gun home in two pieces so he could clean it in preparation for his first weapons inspection the next day.

78.

On August 7, 2018, Sergeant Lukas examined Trooper Lawton's weapon, saw a bolt was missing out of the shotgun, and asked Trooper Lawton to explain; Trooper Lawton told him that he had been cleaning the gun at home and left the bolt at home by mistake.

79.

Trooper Lawton was *never* told by anyone that he was being disciplined for not having the subject bolt in his gun; in fact, a lieutenant told him that it was alright and that "we live and learn."

80.

Sergeant Massey told Trooper Lawton he did not need to speak to him further with respect to not having the subject bolt in his gun, and Massey also told Trooper Lawton that everything was fine regarding the issue of missing a the subject bolt in his shotgun.

81.

Trooper Lawton did not sign any paperwork stating he had violated any policies stemming from the weapons inspection of his 12-gauge shotgun.

82.

Trooper Lawton was not disciplined regarding the inspection of his 12-gauge shotgun and he was not told that any disciplinary/investigatory paperwork would be put in his personnel file regarding this issue.

83.

There is no dispute that Trooper Lawton was told to bring the shotgun into POST, and that he brought the weapon into POST, then opened and disengaged the weapon, to prevent the weapon from being discharged.

84.

Also, Sergeant Peter Lukas told Trooper Lawton that one of his commanding officers should have helped him prepare for his first weapons inspection, because that is customary practice.

85.

Defendants refused to provide remedial training to Trooper Lawton regarding his weapon inspections.

**G.   Damages caused by Defendants racial discrimination.**

86.

Generally, upon information and belief, being terminated from law enforcement prevents you from being hired by another law enforcement agency within five years of said termination.

87.

Generally, being terminated from law enforcement causes extreme difficulty in gaining employment within the law enforcement field.

88.

As an example of the difficulty Trooper Lawton has had in finding employment as a result of Defendants' terminating him, after applying to Fort Valley State Police Department (Fort Valley, Georgia), a representative of the recruiting department told Trooper Lawton that he was automatically disqualified because he had a termination on his POST record.

89.

After being terminated by Defendants, in addition to seeking employment (to no avail) at the Fort Valley State Police Department, Trooper Lawton also applied to the following jobs, to no avail:

1. City of Decatur Police Department – Trooper Lawton's phone calls have not been returned;

2. Chamblee Police Department – Trooper Lawton spoke with Captain Ford of the Chamblee Police Department, and **he informed Trooper Lawton that Defendants sent a write up that disqualified him;**

3. Peachtree City Police Department – Trooper Lawton's phone calls and messages have not been returned; and

4. South Georgia State College – Trooper Lawton was informed that he did not qualify for the position, even though Trooper Lawton was a certified law enforcement officer with a four-year degree and was working on his master's degree.

90.

Trooper Lawton, wanting to work, applied to be a substitute teacher until he could find employment within law enforcement, and he continues to substitute teach even after finding a law enforcement job in December 2019, because his new job pays considerably less than his job as a State Trooper.

91.

Trooper Lawton was fired on August 16, 2018 and was unable to secure another job in law enforcement until December 17, 2019.

92.

On December 17, 2019, Trooper Lawton began a law enforcement job at Albany State University, an African American University.

93.

Trooper Lawton went over a year of being unable to find employment in law enforcement because he had been discriminated upon because of his race and not afforded the same treatment and opportunities as his Caucasian counterparts.

94.

Trooper Lawton's Caucasian counterparts, such as Trooper Anthony Roberts, were permitted to resign instead of being terminated (a common and known practice in law enforcement to avoid the horrific ramifications while seeking further law-enforcement employment, horrific ramifications that Trooper Lawton has experienced). Trooper Lawton simply was not given any warning about his termination and thus was not given any opportunity to resign.

95.

Even if the reasons given by Defendants for Trooper Lawton's termination were to be believed, Trooper Lawton still should have been afforded the multiple chances at re-training that were provided to his Caucasian comparators regarding

the same and similar alleged deficiencies, or he should have been given the option of resigning.

96.

This case demonstrates precisely why comparators are so important because if not for Trooper Lawton's comparators, Defendants would guise their racially motivated and prejudicial ways behind comments such as "Georgia is employment at will."

97.

Trooper Lawton has received psychiatric therapy regarding this situation and while he is not saying he needs treatment for life, this experience has floored him, and the sting of racism hurts beyond description.

98.

Our laws are designed to ensure that discrimination based on race is not an acceptable reality in the workplace.

99.

Notably, despite the circumstances, Trooper Lawton kept working as a substitute teacher until he got another opportunity in the law enforcement field, a profession that formed the basis of his dreams from early childhood.

**COUNT I**
**42 U.S.C. § 1983—VIOLATION OF FOURTEENTH AMENDMENT**
**RIGHTS TO EQUAL PROTECTION**
(*Against All Defendants*)

100.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-99, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

101.

Because the Fourteenth Amendment to the Constitution guarantees that citizens are entitled to equal protection of the laws and thereby cannot be discriminated against based on their race, and because 42 U.S.C. § 1983 prohibits state actors such as all Defendants from violating constitutional rights, Defendants are liable for their unconstitutional conduct **based on the facts incorporated to support this Count I**. Consequently, Plaintiff Lawton is entitled to all permissible damages under law.

**COUNT II**
**42 U.S.C. § 2000e, et. seq. ("Title VII") —VIOLATION OF TITLE VII OF**
**THE CIVIL RIGHTS ACT OF 1964**
(*Against Defendant Georgia Department of Public Safety*)

102.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-99, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

103.

Based on the facts incorporated to support this Count, Defendant employer Georgia Department of Public Safety violated Trooper Lawton's right to be free of racial discrimination **because Defendant Georgia Department of Public Safety's decision to terminate Trooper Lawton's employment was motivated by race, at least in part, if not in whole.** Consequently, Plaintiff Lawton is entitled all permissible damages under law.

**COUNT III**
**CLAIM FOR INJUNCTIVE RELIEF**
(*Against All Defendants*)

104.

Plaintiff now fully incorporates the facts and assertions found in paragraphs 1-99, and any other facts this Court deems relevant, as if fully stated herein to support all allegations made in this Count.

105.

At all times relevant to this Complaint, Plaintiff Lawton had a right to be free from violations and deprivations of his constitutionally secured rights.

106.

Based on the incorporated facts to support this Count, Defendants discriminated against Plaintiff Lawton because of his race, resulting in his termination. Consequently, Plaintiff Lawton requests injunctive relief, reinstating Plaintiff Lawton to his position as State Trooper.

**COUNT IV**
**ATTORNEY FEES**
*(Against All Defendants)*

107.

Based on the facts alleged in this Complaint**,** Plaintiff Lawton is entitled to attorney fees under all applicable laws.

**COUNT IV**
**PUNITIVE DAMAGES**
*(Against Defendant Waldrop)*

108.

Based on the facts alleged in this Complaint, Plaintiff Lawton is entitled to punitive damages from Defendant Waldrop under all applicable laws.

## COUNT V
## SPECIAL DAMAGES
*(Against All Defendants)*

109.

Based on the facts alleged in this Complaint, Plaintiff Lawton is entitled to special damages in an amount not less than one hundred thousand dollars ($100,000).

**WHEREFORE**, Mr. Lawton prays for a trial by jury of twelve and judgment against Defendants as follows:

(a) That process issue and service be had on each Defendant;

(b) That Plaintiff recover all costs of this litigation, including special damages, punitive damages and compensatory damages;

(c) That a jury trial be had on all issues so triable;

(d) And that Plaintiff receives such other and further relief as the Court deems just and proper.

Respectfully submitted this 24th day of January 2020,

/s/MARIO WILLIAMS
Mario B. Williams (Ga # 235254)

**WILLIAMS OINONEN, LLC**
44 Broad Street NW, Suite 200
Atlanta, GA 30303
404-654-0288 / 404-592-6225 FAX
mario@goodgeorgialawyer.com
mwilliams@ndh-law.com